TITANIUM ORES CORPORATION, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 11253.

United States District Court
D. Maryland.
May 15, 1962.

Joseph J. Lyman, Washington, D. C., for plaintiff.

Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, Myron C. Baum, Harvey G. Schneider, Attys., Dept. of Justice, Joseph D. Tydings, U. S. Atty., Robert W. Kernan, Asst. U. S. Atty., for defendant.

WINTER, District Judge.

Plaintiff has sued to recover Federal Insurance Contribution Act taxes and income withholding taxes paid on account of a certain Henry J. Brockman for the first three quarters of 1956. The essential question to be decided is whether Mr. Brockman was an employee of plaintiff for the period in question, within the meaning of 26 U.S.C.A. §§ 3121(d) and 3401(c).

Plaintiff is a Maryland corporation chartered, *inter alia*, to engage in the business of mining, dredging and processing mineral sands. In 1953 it first issued and sold common stock. In 1955, to enable it to raise more capital to begin active operations, plaintiff undertook to sell an additional 300,000 shares of its common stock, of the par value of $ .10 per share, at and for the price of $1.00 per share. The sale extended into 1956. Numerous salesmen were employed for that purpose, including Mr. Brockman. The sale was conducted by plaintiff, itself, and not through underwriters, pursuant to a Regulation A Securities and Exchange Commission Notification, which advised the Commission that Mr. Charles E. Jefferson, president of plaintiff, will "supervise the offering and sale of the stock * * * salesman will be employed." Similar language was contained in the offering circular, also filed with the S.E.C., together with the statement that no underwriter would be employed, but that the shares "will be sold by the issuer."

Mr. Brockman was an experienced securities salesman. He had performed that function for stock brokers in New York City and Baltimore for some years in the past, and was a member of the National Association of Security Dealers.

Mr. Brockman's association with plaintiff was governed by an oral contract. He maintained his residence in New York and would report to plaintiff's Silver Spring or Baltimore office shortly before noon on Mondays. He would work during the day and late into the evenings and return to his home Thursday afternoon or evening.

Mr. Brockman was assigned exclusively to the solicitation of existing stockholders to buy additional stock. He performed his services in the principal office of the plaintiff in Silver Spring, Maryland, or in another office of the plaintiff in Baltimore. Mr. Brockman was furnished desk space, phone service, stenographic service, forms, postage, and record cards, at no expense to himself. He was furnished a list of persons who already owned plaintiff's stock and, according to his own testimony, his function was to encourage them to buy more shares. This function was performed by calling them on the telephone, introducing himself as a representative of plaintiff, and seeking to interest them in the purchase of additional stock. Such an inquiry on his part would generally elicit questions from existing stockholders, and he gave them information which was furnished him by the plaintiff. In the event an existing stockholder concluded to purchase additional shares, Mr. Brock-

man would make a note on the record card containing the name of that stockholder, and plaintiff, through other employees, would send the stockholder a confirmation and, upon receipt of payment, effect delivery of certificates representing the shares purchased.

On only two or three occasions did Mr. Brockman have conferences with persons outside of plaintiff's offices. On at least two of these occasions, Mr. Brockman was driven to the place of the meeting either by plaintiff's president or a Mr. Bost, who was in overall charge of stock purchase solicitations. All other solicitations were with stockholders of plaintiff, whom he telephoned from plaintiff's offices.

Mr. Brockman was employed on a commission basis. Officers and employees of plaintiff received 18¢ out of each dollar for each share of stock sold, and of the 18¢ Mr. Brockman received 11¼¢, the balance being paid to others. Until March 17, 1956, Mr. Brockman was paid $300.00 per week guaranteed drawing account, together with hotel expenses while in the Silver Spring-Baltimore area. From March 17, 1956 until the termination of his services on September 13, 1956, he received a $200.00 guaranteed weekly drawing account.

During the time that Mr. Brockman performed services for plaintiff he sold securities for no one else because, as Mr. Brockman explained, he was physically too tired after Thursdays to engage in such activities, and because the National Association of Securities Dealers prohibits its licensed members from working for two firms at the same time.

Mr. Jefferson, the president of plaintiff, testified that he exercised no actual supervision over the performance of Mr. Brockman's services. This was due in large part to the fact that Mr. Brockman was an experienced security salesman. Mr. Jefferson also testified that plaintiff reserved the right to discharge its salesmen, and that he would have discharged Mr. Brockman if Mr. Brockman had not been able to produce. Mr. Jefferson further said that Mr. Brockman was not prohibited, as far as plaintiff was concerned, from selling other securities for other persons.

The statutes involved in this case are §§ 3111 and 3121 of the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 3111 and 3121, which comprise a part of the Federal Insurance Contributions Act, and § 3401 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 3401, which defines wages of an employee subject to withholding by the employer. § 3111 requires an employer to pay an excise tax with respect to individuals in his employ equal to named percentages of the wages paid by him with respect to employment, and § 3121(d) of the Act defines the term "employee" as:

"(1) any officer of a corporation; or

"(2) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee; or

"(3) any individual (other than an individual who is an employee under paragraph (1) or (2)) who performs services for remuneration for any person—

"(A) as an agent-driver or commission-driver engaged in distributing meat products, vegetable products, fruit products, bakery products, beverages (other than milk), or laundry or dry-cleaning services, for his principal;

"(B) as a full-time life insurance salesman;

"(C) as a home worker performing work, according to specifications furnished by the person for whom the services are performed, on materials or goods furnished by such person which are required to be returned to such person or a person designated by him; or

"(D) as a traveling or city salesman, other than as an agent-driver or commission-driver, engaged upon a full-time basis in the solicitation on behalf of, and the transmission to, his principal (except for side-line sales activities on behalf of some other person) of orders from wholesalers, retailers, contractors, or operators of hotels, restaurants, or other similar establishments for merchandise for resale or supplies for use in their business operations;

if the contract of service contemplates that substantially all of such services are to be performed personally by such individual; except that an individual shall not be included in the term 'employee' under the provisions of this paragraph if such individual has a substantial investment in facilities used in connection with the performance of such services (other than in facilities for transportation), or if the services are in the nature of a single transaction not part of a continuing relationship with the person for whom the services are performed."

In regard to withholding, § 3401 simply defines "wages" as all remuneration for services performed by an "employee" for his employer. The withholding provisions of the Internal Revenue Code do not attempt to define an "employee," but the two statutes seem to be in *pari materia*, the parties have so treated them, as have prior Court decisions, and they will be so treated in this proceeding.

The applicable Treasury Regulation is found in 26 C.F.R. § 31.3121(d)–1, and of that regulation the following provision is pertinent:

"(c) *Common law employees.* (1) Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.

"(2) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules. Individuals such as physicians, lawyers, dentists, veterinarians, construction contractors, public stenographers, and auctioneers, engaged in the pursuit of an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees. \* \* \*"

In the briefs of the parties, much discussion is devoted to the legislative reports concerning House Joint Resolution 296 of the 80th Congress, 2d Session

(1948), 26 U.S.C.A. § 1426(d), which had the effect of amending, retroactively, the predecessor section of § 3121(d) of the Internal Revenue Code of 1954. Briefly stated, the genesis of the resolution follows. In deciding United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), the Supreme Court, while applying the concept of the common law relationship of employer and employee, modified by the need for federal uniformity and the remedial purposes of Social Security legislation, employed language indicating that another test, commonly referred to as the "economic reality" test, should be the basis for determining Social Security coverage. Thereafter, the Treasury Department announced the tentative promulgation of new regulations to reject the common law employer-employee concept and to amplify the economic reality test. The Resolution to block any further liberalization of the employer-employee concept ensued.

The legislative history of the Resolution is found in 2 U.S.Code Cong. & Adm. News, 80th Congress, 2nd Session, p. 1752 et seq. A detailed analysis of this history is unnecessary, other than to say that the basic Congressional intent was that the word "employee" should have its usual meaning under the common law rules "realistically construed." Plaintiff argues that the corollary concept of independent contractor was intended to be extended, but the legislative history does not go beyond an expression of intention to maintain the status quo after rejection of the "economic reality" test announced as dictum in the United States Supreme Court cases and sought to be embodied in the law by the proposed regulations, Ringling Bros.-Barnum & Bailey Com. Shows v. Higgins, 189 F.2d 865, 867 (2 Cir. 1951).

Plaintiff argues that under the common law concept, realistically construed, Mr. Brockman was not an employee, while the Government argues that there was sufficient control in regard to the activities of Mr. Brockman that he constitutes an employee for purposes of Social Security contributions and the requirement of withholding of income taxes.

The common law concept of employee is best expressed in 1 Restatement of the Law (Agency 2d 1958) § 220. It suffices to say that of the factors to be considered the most basic is the right to determine what shall be done and how it shall be done, Singer Manufacturing Co. v. Rahn, 132 U.S. 518, 10 S.Ct. 175, 33 L.Ed. 440 (1889); Ewing v. Vaughan, 169 F.2d 837, 839 (4 Cir. 1948). It is clear also that the "realistically construed" aspect of the common law concept results in a judicial gloss extending the common law concept beyond its usual scope in the field of torts. United States v. Vogue, Inc., 145 F.2d 609 (4 Cir. 1944); Ringling Bros.-Barnum & Bailey Com. Shows v. Higgins, supra.

Many cases involving salesmen of many types have been decided by the courts, see Annotation 29 A.L.R.2d 751, 756, 778 (1953). Each depends on its own facts, Capital Life & Health Ins. Co. v. Bowers, 186 F.2d 943 (4 Cir. 1951), Weatherguard Corporation v. United States, 146 F.Supp. 942, 137 Ct. Cls. 359, 1957, but in each due regard is afforded to the factors of right to control, not only as to the result to be accomplished by the work, but the details and means by which that result is accomplished. When the facts of the case at bar are considered in the light of those factors, the tests prescribed by the Regulation and the common law tests spelled out in the Restatement, supra, the Court concludes that Mr. Brockman was an employee within the meaning of the statutes and regulations in question.

Mr. Brockman was employed to carry out work which plaintiff variously represented in its notices to the S.E.C. as work which it would perform and work which it would "supervise." That pattern was clearly followed in the relationship between Mr. Brockman and plaintiff. Plaintiff determined what persons Mr. Brockman would communicate with as prospective purchasers. Plaintiff determined within reasonable bounds what

Mr. Brockman would say to those persons. The services performed by Mr. Brockman were, with rare exception, performed in the presence of superior officers and employees of plaintiff. It clearly retained the right to discharge Mr. Brockman. It furnished Mr. Brockman with the tools and place of his employment. While Mr. Brockman had much experience in selling securities, the nature and circumstances of his services on behalf of plaintiff corporation were such that his experience and individual initiative were confined within narrow limits. Mr. Brockman's daily activities for plaintiff corporation are clearly distinguishable from those performed in any conventional broker-client relationship.

Plaintiff stresses the lack of evidence to show that plaintiff exercised day by day supervision and control over the details and means by which Mr. Brockman's services were performed. The significance of such absence is reduced by a consideration of Mr. Brockman's experience, the limited sphere of Mr. Brockman's activities and the corresponding lack of need for such control.

Plaintiff's furnishing to Mr. Brockman a list of persons to solicit and the information to give those persons was as much actual control as was called for. See, in this regard, Security Roofing & Construction Co. v. United States, 163 F.Supp. 794, 796 (D.C.Mass.1958); Ben v. United States, 139 F.Supp. 883 (D.C. N.D.N.Y.1956), aff'd., 241 F.2d 127 (2 Cir. 1957); Westover v. Stockholders Publishing Company, 237 F.2d 948 (9 Cir. 1956).

Moreover, the regulations and the cases make clear that the right to control, rather than the fact of actual control, is what is decisive. That plaintiff retained ultimate control—the right to discharge—was admitted by plaintiff's president in response to the Court's question. This factor alone does not always spell out the right to control, as plaintiff argues. McGowan v. Lazeroff, 148 F.2d 512 (2 Cir. 1945). Coupled with the other factors recited above pointing to the conclusion that Mr. Brockman was an employee, the right to discharge meant a far greater right to control than that customarily exercised over an independent contractor. Plaintiff's argument to the contrary, as well as its argument that each sale of stock should be treated as a separate transaction, insofar as the right to discharge existed, are rejected. In regard to the latter, the record is clear that Mr. Brockman was employed for an overall project. There is a conspicuous lack of evidence that the parties either negotiated or intended to negotiate a new contract between them each time that Mr. Brockman was successful or unsuccessful in persuading one of plaintiff's stockholders to buy additional shares of stock.

Plaintiff places much reliance on Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan, 179 F.2d 882 (8 Cir. 1950), cert. den. 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605 (1950). That case involved real estate salesmen recruited by a real estate brokerage firm, the business of which was to sell real estate of others upon commission. Salesmen were afforded office space and facilities, advice and cooperation, business forms, cards and stationery, and were given access to listings. Each salesman purchased his own license, provided his own transportation and paid his own expenses. Salesmen ordinarily reported to the main office daily, but were not required to do so. Over week-ends they took turns keeping the office open for their mutual benefit. The brokerage firm provided a booklet of instructions and "For Sale" signs. Compensation was a share of commissions, sometimes with a bonus, but there were no expense accounts or regular drawing accounts.

Under these facts, the salesmen were held not to be employees. The Commissioner of Internal Revenue acquiesced in this decision, and in EmT. Mimeograph Coll. No. 6566, December 8, 1950, advised collectors of internal revenue and others concerned that *security salesmen* performing services for *security dealers* under circumstances and conditions like those present in the Dimmitt case would also not be considered employees for pur-

poses of withholding and employment taxes.

While similar in many respects, close analysis shows the Dimmitt case to differ sufficiently from the case at bar so as not to control. The inherent degree of control over real estate salesmen whose principal services are performed outside of the broker's office and who must rely largely on their own initiative, efforts, skill and personality in obtaining listings and prospective purchasers differs markedly from a security salesman, not associated with a dealer, who is furnished, indeed limited to, a given list of prospective purchasers and further limited as to his manner of selling. In the case at bar there was actual control and the right to control lacking in the Dimmitt case.

Taking into consideration the common law test of the employer-employee relationship, and the common law test "realistically construed," the Court concludes that Mr. Brockman was an employee within the meaning of the statutes and regulations involved. Plaintiff's claim to refund fails, and judgment will be entered for defendant, with costs. Counsel for defendant may present an order.