THOR COMPANY, Minnie E. Thorson and Robert H. Thorson

v.

UNITED STATES of America.

Civ. A. No. 57–698.

United States District Court
D. Massachusetts.
May 5, 1959.

Robert F. White, Boston, Mass., Joseph J. Lyman, Washington, D. C., for plaintiffs.

Anthony Julian, U. S. Atty., Andrew A. Caffrey, Asst. U. S. Atty., Boston, Mass., for defendant.

FRANCIS J. W. FORD, District Judge.

This is an action to recover Federal Insurance Contribution Taxes and Federal Unemployment Taxes alleged to have been erroneously paid on the earnings of certain applicators for the period June 30, 1952, through December 31, 1954. Timely application for refund was made and not allowed within six months following the filing of the claim.

The issue is whether certain piecework applicators with respect to whose earnings the taxes were paid were employees of plaintiffs on whose earnings plaintiffs were liable for a tax. The applicable statutory provisions are contained in the 1939 Internal Revenue Code, 26 U.S.C.A. §§ 1426(d)(2) and 1607(i), now found in the 1954 Internal Revenue Code, 26 U.S.C.A. §§ 3121(d)(2) and 3306(i), which make the usual common law rules applicable in determining whether an individual for purposes of these taxes has the status of an employee or an independent contractor. The test is more specifically stated in the applicable treasury regulations which provide, 26 C.F.R. §§ 402.204(b) and 403.204(b), "Generally such relationship [of employer and employee] exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished * * *."

Plaintiffs Robert H. Thorson and Minnie E. Thorson during the period in question conducted a home improvement business as a partnership under the name of Thor Roofing Company. On December 31, 1955, the business was transferred to Thor Company, a Massachusetts corporation.

The applicators in question were engaged in the application of roofing and siding materials to dwelling houses and other buildings. Plaintiffs employed salesmen who obtained contracts for the performance of this work from the building owners. A work order was then prepared for the job setting out the work to be done in accordance with the contract. When an applicator reported to plaintiffs' office, he was given a copy of a work order for the job. Except for this work order, there was no written agreement between plaintiffs and the applicators. Necessary materials, ladders and staging were delivered to the site by plaintiffs, who removed the equipment and unused material after the work was done. The applicator provided his own tools, only a few ordinary tools such as a hammer, knife and saw being necessary. Occasionally an applicator who did not have a

necessary tool would borrow one from plaintiffs.

Payment for the work was made on the basis of a fixed rate for each unit or square of siding or roofing applied. Certain jobs, known as "cut up" jobs, required extra work in cutting and fitting material because of irregularities in the shape of the building. When an applicator asked for extra money for such a job, the price was negotiated between him and the superintendent. If no agreement could be reached, the superintendent would negotiate with some other applicator.

An applicator did not have to take any particular job offered him. If he refused a job, he would be offered another one if it was available. Ordinarily when an applicator finished a job, he returned to the office for another one. However, he was not required to do so, and applicators could and sometimes did go to work for a time for competitors of plaintiffs and later returned to work for plaintiffs. An applicator made no agreement to work regularly for plaintiffs nor did plaintiffs agree to continue to give him further jobs for any specific period of time. An applicator assigned to a job was not shifted to another job until he had finished his work.

Applicators had no specified working hours, but each applicator worked such hours as he wished. Ordinarily he traveled to and from the job at his own expense, although on jobs lying outside the area served by the Metropolitan Transit Authority he might be reimbursed for extra travel expense. An applicator could draw his payment for each job when it was finished and at the end of the week could draw a partial payment on an unfinished job for that part of the work which he stated he had done.

On small jobs the work was done by a single applicator. On larger jobs the superintendent arranged to have two or more men do the work, but such arrangements were always with the consent of the men involved. Some applicators had regular partners with whom they preferred to work. Applicators as-signed to a job sometimes hired helpers of their own choice. In all these cases the payment for the job was divided among the men on the basis of an agreement made by the men themselves.

The building owner sometimes requested the applicator to do extra work not called for by the contract. Often, especially when this involved minor repairs, the applicator did this work on his own without notifying plaintiffs and was paid directly by the owner. Otherwise he notified the company and a further contract was arranged between plaintiffs and the owner and a work order issued for this work. When other homeowners made inquiries of an applicator about having work done for them, he would refer them to the company, and if a contract resulted, a commission would be paid to the applicator furnishing the lead.

Plaintiffs had a superintendent who gave out work orders to the applicators, saw that necessary materials were taken to the job site, and visited the jobs from time to time. On a short job he might never visit it, on a long job he might appear three or four times. His duty on these visits was to check to see that the work was being completed in accordance with the contract. At times he directed that a part of the work which did not meet contract requirements be removed and done over. All the applicators were experienced workers and the superintendent did not give them any directions as to the detailed methods to be used in applying the roofing or siding materials. It was the duty of the applicator to perform the work called for on his work order and to obtain the signature of the owner to a certificate that the work had been satisfactorily completed in accordance with the contract.

Occasional meetings of plaintiffs' employees were held at which a few piecework applicators were present. While there was some discussion at these meetings as to problems encountered in the application of materials, the principal purpose seems to have been sales promotion. Applicators present were encour-

aged to report leads and were told they would receive a commission on any resulting contracts.

Plaintiffs had some full-time salaried employees and other employees paid on an hourly basis.[1] These men were used on repair jobs and on flat roofing work, which calls for different methods than those used by applicators on slope roofing. At times they also did the same type of work as the applicators here in question, as in instances where an applicator for some reason failed to finish a job, or where the superintendent was unable to negotiate with any of the piecework applicators a satisfactory price for a "cut up" job. Men on a salary or hourly pay basis worked regular hours, were supplied with tools by plaintiffs and transported by plaintiffs from the office to the job site.

The same individual might at different times work for plaintiffs on a salaried or an hourly pay basis or as a piecework applicator. Plaintiffs' claim for refund for any of the quarters of the period involved is asserted only as to taxes on payments to persons who during that entire quarter worked only as piecework applicators.

Plaintiffs provided workmen's compensation insurance which covered these piecework applicators and these applicators, or at least those who happened to be working for plaintiffs at the anniversary date when membership was open, were told they could join the Blue Cross-Blue Shield group for plaintiffs' employees and two or three of them did join.

The issue here is whether the plaintiffs here under the above-described arrangements with these applicators retained the right to control them as to the details and means by which they carried out their work, or only the right to control the result. It is clear that in fact no actual control over means and details was exercised. This, of course, is not decisive of the issue as to the right to exercise such control, since an employer dealing with experienced workers who knew how to do the work might have little occasion to exercise such control. There was no express agreement spelling out the extent to which plaintiffs had control over the work, nor does there appear to be any single factor which decisively settles the issue. The question resolves itself into one of drawing a conclusion from the situation as a whole as to what sort of relationship the parties intended to establish. The picture presented is one of a relationship in which plaintiffs were interested only in the result accomplished, that is, the completion of the work in accordance with their contract with the building owner. The applicators were experienced workers who knew how to do the work, who were free to work when and as they wished, were free to reject jobs they did not want, were paid on the basis of the job either at a standard rate based on the size of the job or at a negotiated price per job if they were not satisfied with the standard rate, were free to choose those with whom they worked, and to decide how payment for a job was to be divided when several men worked on the same job. On all the facts it must be found that the relationship between plaintiffs and the applicators here involved was one in which plaintiffs had the right to control only the result to be accomplished and not the details and means by which it was accomplished and that the status of these applicators was that of independent contractors and not of employees within the meaning of the applicable statute and regulations.

Little significance can be given to the evidence as to Blue Cross-Blue Shield membership and workmen's compensation coverage. At best this evidence only indicates that plaintiffs may have believed, whether rightly or wrongly, that the applicators might be employees for those purposes. As to Blue Cross-Blue Shield while there was evidence that only employees were eligible for group

[1]. In addition the plaintiffs hired office workers and truck drivers on a salary basis and also salesmen who were compensated on a commission basis.

membership, the Blue Cross-Blue Shield representative who testified was unable to say whether this meant employees in the common law sense, or under some other definition. As to workmen's compensation coverage, plaintiffs may have believed it safer to provide such coverage to protect themselves in case the applicators might sometime be held to be employees—just as they paid the taxes here in question as if the applicators were employees but now assert their contention to the contrary in this action to recover the taxes. The sole issue here is whether these applicators were employees within the meaning of the pertinent Federal tax statutes. This question cannot be determined by whether or not they were employees within the meaning of a state workmen's compensation law or some hospital insurance plan. Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan, 8 Cir., 179 F.2d 882; Edwards v. United States, Ct.Cl., 168 F.Supp. 955, 958. Much less is it determined by what plaintiffs rightly or wrongly may have thought the status of the applicators was under such a state statute or private plan.

■ It may be noted that arrangements such as the one described here seem to be general in the home improvement industry and have led to frequent litigation of the precise question involved in this case. Each of these cases, of course, rests on its own peculiar facts, but in general the finding has been that the applicators were independent contractors rather than employees. Edwards v. United States, Ct.Cl., 168 F. Supp. 955; Jagolinzer v. United States, D.C., 150 F.Supp. 489; Millard's Incorporated v. United States, D.C., 146 F. Supp. 385; Silver v. United States, D. C., 131 F.Supp. 209; Metropolitan Roofing & Modernizing Company, Inc. v. United States, D.C., 125 F.Supp. 670; Levin v. Manning, D.C., 124 F.Supp. 192. A similar result has been reached in the most recent case in this district, American Homes of New England, Inc. v. United States, D.C., 173 F.Supp. 857.

Cases in which a contrary holding has been made are distinguishable as presenting somewhat different factual situations with certain elements indicative of an employer-employee relationship which led to a different result. Security Roofing & Construction Co., Inc. v. United States, D.C., 163 F.Supp. 794; Ben v. United States, D.C., 139 F.Supp. 883, affirmed 2 Cir., 241 F.2d 127; Bonded Insulation & Construction Company, Inc. v. United States, D.C., 131 F.Supp. 635.

■ Defendant has filed a motion to dismiss for failure to join indispensable parties. Counsel for the United States stated that these indispensable parties were the applicators, on the ground that their rights to social security, Blue Cross and workmen's compensation benefits may be affected by the Court's decision in this case. The government did not, either in the course of the trial or in its brief, offer any further evidence or argument in support of this contention. It does not appear that the contention is well founded. This action is brought by plaintiffs solely to recover taxes paid by them. The applicators have no direct interest in this controversy, nor does it appear that their rights are directly affected. It is true that the right of the applicators to certain benefits may depend upon whether or not, for the purposes of eligibility for those benefits, they are employees or independent contractors. That question is similar to but not the same as the only question which this court now purports to decide, whether or not they were employees within the meaning of statutes imposing taxes on the plaintiffs. The applicators' status for other purposes is not at issue here, nor would it seem that they would be bound by any attempt to decide such status in a proceeding in which they are not parties.

Defendant's motion to dismiss is denied. Judgment will be entered for plaintiffs. In accordance with the stipulation at the trial, the amount of the judgment will be agreed upon by the parties.